**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
CHANEL, INC., et al.,

                              Plaintiffs,

              - against -

MICHAEL JEAN-LOUIS, et al.,

                            Defendants.
-----------------------------------------------------------X

**REPORT AND**
**RECOMMENDATION**

CV 06-5924 (ARR) (JO)

**JAMES ORENSTEIN, Magistrate Judge:**

       In a Complaint filed on November 1, 2006, plaintiffs Chanel, Inc. ("Chanel") and Louis Vuitton Malletier, S.A. ("Vuitton") accused defendant Michael Jean-Louis ("Jean-Louis") of violating their rights under federal and state trademark protection laws by advertising and selling counterfeit products bearing the plaintiffs' registered trademarks. Docket Entry ("DE") 1 (Complaint). Jean-Louis never responded to the Complaint, and after prompting by the court, the plaintiffs successfully sought to have the Clerk note Jean-Louis's default. DE 5; DE 6. The Honorable Allyne R. Ross, United States District Judge, referred the matter to me for a damages inquest and a report and recommendation. DE 8. I now make my report and, for the reasons set forth below, respectfully recommend that the court award judgment to Chanel in the amount of $111,000 on its Lanham Act Claims; award judgment to Vuitton in the amount of $90,000 on its Lanham Act claims; award costs in the amount of $525 to be shared by both plaintiffs; and deny the remainder of the plaintiffs' requests for relief, including judgment on the copyright and patent claims, their request for injunctive relief, and their request for an unspecified amount of attorneys' fees.

I.    Background

Chanel is a New York corporation and Vuitton is a business organized under French law. Each manufactures and sells handbags, wallets, and other products, and each owns a variety of federally registered trademarks that it uses in marketing its products. Neither Chanel nor Vuitton has abandoned its marks and trade dress nor licensed or otherwise assigned them to Jean-Louis. Complaint ¶¶ 2, 3, 8-12; *see also* DE 14 (Motion for Default Judgment) ("Motion"); Exs. E-G.

Over a year before filing its Complaint, Chanel suspected that Jean-Louis was selling counterfeit Chanel and Vuitton handbags over the Internet. It retained investigator Robert Holmes ("Holmes") of the Holmes Detective Agency to investigate. Holmes ascertained that the web site through which the suspected counterfeit merchandise was offered, BestDeluxe.com, was registered to the defendant Jean-Louis. In February 2005, Holmes placed an order through that web site for a handbag bearing the Chanel marks; he received the handbag approximately three months later. At the time he placed the order, he confirmed that the web site also sold items bearing Vuitton marks. Holmes turned the product he received over to Chanel, and the latter subsequently determined it to be counterfeit. *See* Motion Ex. B (Declaration of [Chanel's Director of Legal Administration] Adrienne Hahn Sisbarro) ("Sisbarro Dec.") ¶¶ 9-11; Motion Ex. H (Declaration of Robert Holmes) ("Holmes Dec.") ¶¶ 5-9. Similarly, Nikolay Livadkin, the Anti-Counterfeiting Manager for Vuitton, reviewed the BestDeluxe.com site and discovered items bearing one or more of the Vuitton marks and determined them to be counterfeit; he also noted that the web site used unauthorized copies of certain photographs for Vuitton's web site, the rights to which Vuitton owns, to advertise its ersatz wares. Motion Ex. D (Declaration of Nikolay Livadkin) ("Livadkin Dec.") ¶¶ 2, 10-11.

In October 2005, for reasons he never explains, Holmes decided to expand his investigation to an additional two web sites, OfficialBag.net and OfficialBag.com, from which he also arranged to purchase suspected counterfeit merchandise. Holmes Dec. ¶¶ 10-14. Holmes purports to have concluded that the latter two sites "were owned and operated by" Jean-Louis, Holmes Dec. ¶ 15, but his explanation for that conclusion is entirely unpersuasive. Specifically, he cites a telephone call from Jean-Louis's mobile telephone during his communication "with the subject" (without explaining whom the "subject" might be) and a postmark on the package for a handbag shipped by OfficialBag.net revealing that it originated in "the Defendant's actual neighborhood" in Queens, New York. *Id*. He then goes on to offer the following, which I am constrained to reproduce in full because I am unable to comprehend its logic:

> Also, I [sic] the payee name for the handbag I purchased from OfficialBag.net was Direct Western, which I have determined is an electronic sales web site also owed and operated by Michael Jean-Louis. I further determined this through inspecting the "image" directory on his web site bestdeluxe.com web site [sic], which was not password protected and available to the public. This directory included stored web content from the web site directwestern.com.

*Id*.

As best I can understand Holmes's reasoning, the fact that Jean-Louis's bestdeluxe.com site contained stored content that originated from the directwestern.com site[1] suffices to prove that Jean-Louis "owned and operated" the latter. It does not, but even if it did, it would not follow that the use of a similar but not identical payee name in a transaction involving OfficialBag.net would therefore sustain the conclusion that there is any connection between

---

[1] Holmes does not explain why he believes that some unspecified file he discovered in the image directory for the bestdeluxe.com site originated from the directwestern.com, and does not provide any evidence that would allow the court to determine whether his conclusory assertion in this regard is true.

OfficialBag.net and Jean-Louis.  Finally, I note that literally none of the evidence that Holmes

purports to rely on in this regard has anything to do with the OfficialBag.com site; there is simply

no evidence in the record of any connection between the latter web site and defendant Jean-

Louis.  As a result, to the extent that the plaintiffs have a burden of proof in this regard, I

conclude that the plaintiffs have not demonstrated the relevance to their claims against Jean-

Louis of any transaction involving the OfficialBag.com or OfficialBag.net web sites.[2]

The plaintiffs filed the instant action on November 1, 2006, alleging that Jean-Louis,

acting together with business associates the plaintiffs did not name, violated the Lanham Act, 15

U.S.C. § 1051 *et seq.*, and 15 U.S.C. § 1125(c) (prohibiting trademark dilution), as well as

common law prohibitions on trademark infringement and unfair competition, by selling lesser

quality replicas of Chanel and Vuitton's products without their consent.  Complaint ¶¶ 1, 35, 42,

45, 62, 66.  Specifically, the plaintiffs allege that, by use of his Internet web site, Jean-Louis sold

handbags bearing exact copies of Chanel's marks and trade dress and Vuitton's marks, thereby

counterfeiting and infringing Chanel's and Vuitton's respective trademarks.  *See* Complaint ¶¶

[2]  The plaintiffs alleged in the Complaint that Jean-Louis "uses the names OfficialBags.net [sic], OfficialBag.com, and BestDeluxe.com as aliases to operate his business."  Complaint ¶ 4.  As discussed below, Jean-Louis's default establishes the truth of that allegation for purposes of liability (as to which the deletion of the "OfficialBag" names would have no effect), but it does not do so with respect to the issue of damages or other relief.  Accordingly, it is on the latter issue that the quality of Holmes's evidence may have some import.   Although I discount the assertions concerning the "OfficialBag" sites in analyzing the plaintiffs' requests for damages, I now summarize those assertions in the interest of providing a complete report.  Specifically, Chanel's expert, Ms. Sisbarro, examined the items available for sale on the Officialbag.com and Officialbag.net web sites and confirmed that they were counterfeit based on their price and certain differences in hardware and tag shape.  Sisbarro Dec. ¶¶ 13, 15, 16.  Livadkin also reviewed the OfficialBag.com and OfficialBag.net sites, and similarly determined that the products they offered counterfeit Vuitton items for sale using the Vuitton marks.  Livadkin Dec. ¶¶ 13-15.  I credit those conclusions, but treat them as irrelevant to the instant motion in light of the absence of persuasive proof that Jean-Louis operates the "OfficialBag" sites.

19-21; 15 U.S.C. § 1114(a). The plaintiffs further claim that Jean-Louis's actions deceived both the public and members of the trade into believing that his inferior products are in fact goods produced and approved by Chanel and Vuitton, and thus constituted false designation of origin under the Lanham Act. Complaint ¶¶ 25, 39, 42; 15 U.S.C. § 1125(a).

Vuitton also alleges copyright infringement in violation of 17 U.S.C. § 501 and patent infringement in violation of 35 U.S.C. § 271. Complaint ¶¶ 52, 59. Specifically, Vuitton alleges that Jean-Louis and his associates used copyrighted photographs of its bags taken from its web site to advertise their products, and used Vuitton's copyrighted patterns in the counterfeit bags they sold. Complaint ¶ 52; Motion Ex. F. Vuitton further alleges that defendants sold bags that were identical to its patented designs. Complaint ¶ 57; Motion Ex. G.

Chanel served the Complaint on Jean-Louis on February 7, 2007. DE 4. Jean-Louis never responded. One month later, I noted the lack of activity on the docket, and set a deadline of April 6, 2007, by which time one of the following had to occur or I would recommend dismissal of the case for failure to prosecute: Jean-Louis could answer the Complaint; the parties could stipulate to extend his time to answer; or the plaintiffs could file a motion for the entry of a notation of default. DE 5. On April 6, 2007, absent any response from Jean-Louis, the plaintiffs filed an *ex parte* "MOTION for Default Judgment" against Jean-Louis, the substance of which simply requested that the Clerk enter a notation of default against Jean-Louis. DE 6. The Clerk noted Jean-Louis's default on April 10, 2007. DE 7. Judge Ross later referred the matter to me for report and recommendation. DE 8. The following day I issued an order setting a deadline of November 20, 2007 by which time the plaintiffs had to file a motion for default judgment

complete with all supporting evidence. DE 9. I further directed the Clerk to make the plaintiffs' initial motion available to all parties and the public. *Id.*

The plaintiffs timely moved for a default judgment on November 20, 2007, seeking both injunctive relief and a total statutory damages award of $192,000 for Chanel and $531,750 for Vuitton. DE 14-2 (Plaintiffs' Memorandum of Law in Support of Motion for Default Judgment) ("Memo.") at 17-18, 20-21. The plaintiffs also seek $525.00 in costs. Memo. at 21.

II.     Discussion

A.     Default

When a defendant defaults, the court must accept as true all well-pleaded allegations in the complaint, except those pertaining to the amount of damages. Fed. R. Civ. P. 8(b)(6); *see Finkel v. Romanowicz*, 577 F.3d 79, 83 n.6 (2d Cir. 2009) (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992)). The fact that a complaint stands unanswered does not, however, suffice to establish liability on its claims: a default does not establish conclusory allegations, nor does it excuse any defects in the plaintiff's pleading. With respect to liability, a defendant's default does no more than concede the complaint's factual allegations; it remains the plaintiff's burden to establish that those uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action. *See*, *e.g.*, *id.* at 84; *Directv, Inc. v. Neznak*, 371 F. Supp. 2d 130, 132-33 (D. Conn. 2005) (denying default judgment on several claims based only on conclusory allegations which lacked a sufficient factual basis for a finding of liability); *see also Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 69 (2d Cir. 1971) (default-based liability is established by "well-pleaded allegations in a complaint"), *rev'd on other grounds*, 409 U.S. 363 (1973); *Greyhound Exhibitgroup*, *Inc.*, 973

6

F.2d at 159 (complaint's assertion of proximate cause necessary for finding of liability must be "properly alleged"); *Levesque v. Kelly Communications, Inc.*, 1993 WL 22113, at *5 (S.D.N.Y. Jan. 25, 1993) ("the Court must be satisfied initially that the allegations of the complaint are 'well-pleaded'") (citing *Hughes*, 449 F.2d at 63). Accordingly, before considering the issue of damages as to each cause of action, I first examine whether the Complaint successfully states a claim for relief.

    B.    <u>Trademark Claims</u>

        1.    <u>Lanham Act</u>

            a.    <u>Applicable Law</u>

The Lanham Act serves "to protect the holders of trademarks from the promotion and sale of competing products likely to confuse consumers as to their source." *Chanel, Inc. v. Xiao Feng Ye*, 2007 WL 2693850, at *2 (E.D.N.Y. September 12, 2007) (citing *Tanning Research Labs., Inc. v. Worldwide Import & Export Corp.*, 803 F. Supp. 606, 608 (E.D.N.Y. 1992)); 15 U.S.C. §§ 1114, 1125. A plaintiff can thus prevail on a claim for either trademark infringement or false designation of origin if it can show that the plaintiff owns a valid trademark, and that the defendant's use of that trademark "is likely to cause confusion regarding the source of the product." *Rolex Watch U.S.A., Inc. v. Jones*, 2000 WL 1528263, at *2 (S.D.N.Y. Oct. 13, 2000) (citing *Time, Inc. v. Peterson Publishing Co., L.L.C.*, 173 F.3d 113, 117 (2d Cir. 1999)).

Courts evaluate the element of confusion by considering the eight "*Polaroid* factors." *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). Those factors are: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products in the marketplace; (4) the likelihood that the plaintiff will bridge the

gap between the products (enter a market related to that in which the defendant sells its product); (5) evidence of actual confusion; (6) the defendant's bad faith; (7) the quality of the defendant's product; and (8) sophistication of the relevant consumer group. *Rolex*, 2000 WL 1528263, at *2 (citing *Polaroid*, 287 F.2d at 495). No single factor is dispositive – the court's task is to weigh them with an eye toward "the ultimate question of whether consumers are likely to be confused." *Id.* (quoting *Paddington Corp. v. Attiki Importers & Distrib., Inc.*, 996 F.2d 577, 584 (2d Cir. 1993)).

b.    Liability

I conclude that the plaintiffs' well-pleaded allegations and supporting evidentiary submissions suffice to state a valid cause of action for either trademark infringement or false designation of origin under the Lanham Act. The complaint and Jean-Louis's default together suffice to establish both claims. First, each plaintiff alleges that it owns a variety of federally registered trademarks – Chanel claims sixteen and Vuitton twenty-four – and each has provided ample proof of those registrations. *See* Complaint ¶ 8; Motion Exs. C, E. Second, each plaintiff has clearly alleged facts demonstrating Jean-Louis's unauthorized use of its respective marks. *See* Complaint ¶¶ 19, 21, 23; Sisbarro Dec. ¶¶ 9, 11-13, 15-17; Holmes Dec. ¶¶ 5, 8; Livadkin Dec. ¶¶ 9-11, 13-16. Third, each plaintiff has demonstrated that Jean-Louis's use of its respective marks is likely to cause confusion among consumers. Complaint ¶¶ 20, 25.

The *Polaroid* factors weigh heavily in the plaintiffs' favor, compelling the conclusion that consumers are likely to be confused by Jean-Louis's use of their marks. First, both plaintiffs have marks that, by virtue of being registered, are presumed to be strong, and each has aggressively advertised and promoted its products while maintaining their high quality. *See* Complaint ¶¶ 13-

8

17; Sisbarro Dec. ¶¶ 6-7; Livadkin Dec. ¶¶ 6-7; *Rolex*, 2000 WL 1528263 at *2; *see also The Orb Factory, Ltd. v. Design Science Toys, Ltd.*, 1999 WL 191527, at *7 (S.D.N.Y. April 7, 1999).  As a result, goods bearing the plaintiffs' respective marks are readily identifiable as their respective products.  Complaint ¶ 16.  *See The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960-61 (2d Cir. 1996).  Second, the plaintiffs allege that Jean-Louis is selling goods bearing "exact copies or near facsimiles" of their respective marks but that those goods differ in quality from the corresponding genuine products.[3]  Complaint ¶¶ 19, 20; Sisbarro Dec. ¶¶ 11, 17; Livadkin Dec. ¶ 15.  Third, the plaintiffs allege that Jean-Louis conducts his business in this judicial district, the boundaries of which comprise a market that both of their brands have long occupied.  Complaint ¶¶ 2, 10; Sisbarro Dec. ¶¶ 4, 6. Livadkin Dec. ¶ 5.  Accordingly, both parties have made the showing necessary to prevail on their claims of trademark infringement and false designation of origin.  I therefore respectfully recommend that the court  find Jean-Louis liable on those claims.[4]

---

[3]  In support of the latter allegation a Chanel employee analyzed the handbag purchased through Jean-Louis's web site.  Her declaration states that this handbag was of lower quality than a genuine Chanel bag but does not elaborate further.  Sisbarro Dec. ¶¶ 11, 17.  A Vuitton employee similarly analyzed the photographs and other information on Jean-Louis's web site and asserts that the goods offered for sale "are of different quality to genuine Louis Vuitton products."  Livadkin Dec. ¶ 16.  Such generalizations suffice for purposes of establishing liability in the face of Jean-Louis's default, but do little to help the plaintiffs meet their burden – which is not mitigated by the default – of proving their right to relief to a reasonable certainty.

[4]  Because Chanel does not seek separate relief for its common law claims or its claim of trademark dilution pursuant to 15 U.S.C. § 1125(c), *see* Memo. at 11, the court need not analyze those claims separately on the question of liability if it adopts the analysis above.  *See Chanel*, 2007 WL 2693850, at *3 n.6 (citing *Tanning Research Labs.*, 803 F. Supp. at 608).

c.      <u>Damages</u>

Jean-Louis's default does not relieve the plaintiffs of their burden of proving their damages to a "reasonable certainty." *Credit Lyonnais Securities (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999) (quoting *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997)). Detailed affidavits and other documentary evidence can suffice in lieu of an evidentiary hearing. *Finkel*, 577 F.3d at 83, n.6; *Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 508 (2d Cir. 1991); *Credit Lyonnais*, 183 F.3d at 155. Each plaintiff seeks an award of statutory damages, injunctive relief and costs. In support of their joint application, the plaintiffs have submitted a memorandum of law; declarations from their counsel, an investigator, and a corporate officer; copies of their trademark registrations from the United States Patent and Trademark Office (the "PTO"); and printouts of various pages from Jean-Louis's web sites. DE 14.

A plaintiff who prevails on a Lanham Act claim involving the use of a counterfeit mark in connection with the sale of goods has the option of recovering statutory damages in lieu of actual damages and profits:

> [T]he plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a) of this section, an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of--
>
>> (1) not less than $500 or more than $100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or
>>
>> (2) if the court finds that the use of the counterfeit mark was wilful, not more than $1,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

10

15 U.S.C. § 1117(c).[5]  Congress added this provision in 1995 to address a recurring problem: "counterfeiters' records are frequently non-existent, inadequate, or deceptively kept ..., making proving actual damages in these cases extremely difficult if not impossible."  *Chanel*, 2007 WL 2693850, at *4 (citing *Rodgers v. Anderson*, 2005 WL 950021, at *2 (S.D.N.Y. April 26, 2005)). Of course, that problem is exacerbated where, as here, a defendant defaults.

Both plaintiffs have thus understandably elected to recover an award of statutory damages for Jean-Louis's Lanham Act violations.  Memo. at 17.  The court's discretion in setting such an award is considerable.  A conclusion that a defendant has or has not acted wilfully merely establishes the ceiling for the award; the statute otherwise provides little guidance on how to proceed in any given case.  *Nike, Inc., et al. v. Top Brand Co., et al.*, 2006 WL 2946472, at *2 (S.D.N.Y. February 27, 2006); *Gucci America, Inc. v. Duty Free Apparel, Ltd.*, 315 F. Supp. 2d

---

[5] During the pendency of this motion, on October 13, 2008, 15 U.S.C. § 1117(c) was amended to increase the statutory damages range to "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods ... sold" and also increased the statutory damages available for willful use of a counterfeit mark to "not more than $2,000,000 per counterfeit mark per type of goods ... sold."  Pub. L. No. 110-403, 122 Stat. 4256, 4259 (2008).  When the plaintiffs filed their motion, they naturally relied on the version of the statute in effect at that time, which provided for a minimum award of $500, and a maximum award of $100,000 for a non-willful violation or $1,000,000 for willful infringement. Memo. at 17.  In the months since the statutory amendment, the plaintiffs have not requested that the court apply the new version of the statute, and I conclude it would be appropriate to apply the earlier version rather than give the amendment retroactive effect.  *See Lifted Research Group, Inc. v. Behdad, Inc.,* 591 F. Supp. 2d 3, 8 n.2 (D.D.C. 2008) (applying amendment to 15 U.S.C. § 1117(c) prospectively); *Magna-RX, Inc. v. Holley*, 2008 WL 5068977, *3 n. 4 (D. Ariz. Nov. 25, 2008) (same); *cf. Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 971 (2d Cir.1985) (finding that amendment to treble damages provision of Section 1117 applies prospectively).  In any event, both the damages the plaintiffs request and the somewhat lower damages I recommend are within the range of each version of the statute.  Although my recommendation is calculated in part on the basis of the statutory minimum, I believe that doubling the total amount I recommend to reflect the doubling of the statutory minimum would result in an unwarranted windfall to the plaintiffs.  I would therefore make the recommendation described below regardless of the version of the statute in effect.

511, 520 (S.D.N.Y. 2004) ("*Gucci II*").  Courts in this jurisdiction have sought assistance when fashioning statutory damages awards from the case law construing an analogous provision of the Copyright Act, 17 U.S.C. § 504(c).  *See, e.g.*, *Chanel*, 2007 WL 2693850, at *4; *Nike*, 2006 WL 2946472, at *2; *Gucci II*, 315 F. Supp. 2d at 520; *Sara Lee Corp. v. Bags of New York, Inc.*, 36 F. Supp. 2d 161, 166 (S.D.N.Y. 1999) ("The Copyright Act is not only similar in principle to the Trademark Act but identical in much of its statutory damages language.").  Statutory damages awards for copyright infringement are intended to be both compensatory and punitive.  *Chanel*, 2007 WL 2693850, at *4.  Courts consider a number of factors in reaching an award, including the plaintiff's lost revenues, the infringer's profits and avoided expenses, the value of the copyright (or trademark), wilfulness, and general and specific deterrence.  *Id.*; *Gucci II*, 315 F. Supp. 2d at 520; *Sara Lee*, 36 F. Supp. 2d at 166.

Chanel and Vuitton request statutory damages in the amount of $192,000 and $504,000 respectively.  Memo. at 17-18.  They justify that amount as follows: $500 per mark counterfeited per type of goods, trebled to reflect the defendant's willfulness, and then doubled for the purpose of deterrence, for a total damage award of $3,000 per mark per counterfeited type of product.  *Id.* at 18.  I accept this reasoning, but only to a certain extent.  Specifically, to the extent that a single item is found to have infringed a single mark, I believe that the proposed penalty conforms with the principles behind the Lanham Act's statutory damages provision:  first, statutory damages are a substitute for actual damages, and should replicate as nearly as possible the actual harm done to the successful plaintiff without punishing it for lacking information on the issue due to the absent defendant's default.  Second, Congress has manifestly determined that in the absence of additional facts, an award of $500 per violation can suffice to achieve both an approximation of

actual harm *and* the legitimate goal of punishing the offender.  To the extent the court awards an amount above that $500 baseline, it should have a basis in the record for doing so.  There are some such facts in the record:  the plain fact of Jean-Louis's intention to trade off of the plaintiffs' intellectual property; the duration of Jean-Louis's operation; and plaintiffs' assertion (which I credit) that they have expended considerable resources to develop and promote their marks and trade dress.  Complaint ¶ 13.  Based on those considerations, I respectfully recommend that the court start with the baseline statutory award of $500 per marketed item, treble it to reflect Jean-Louis's willfulness, and then double the product for the purpose of deterrence, for a total of $3,000 per item.

On the other hand, awarding multiples of $3,000 for multiple marks on a single infringing item would appear to overcompensate.  To the extent a single counterfeit mark improperly identifies an ersatz product with its ostensible producer, the aggrieved plaintiff undoubtedly suffers some harm that arises from the likelihood that the consumer will incorrectly believe the counterfeit to be the plaintiff's product.  But that harm does not necessarily double simply because the product bears two counterfeit marks of the same producer.  To the contrary, it seems doubtful that there is any additional actual harm at all.  Moreover, such multiplication would needlessly increase both the punitive and deterrent aspects of the award:  an infringer's willful replication of a protected product does not become worse simply because the replication involves several marks rather than one; and if increasing an award by $1,500 is deemed sufficient to deter future infringement involving a single mark, I do not understand why the same award would not also suffice to deter infringing acts involving multiple marks (which would presumably require virtually no incremental investment of effort on the part of the infringer).

13

Finally, to the extent that the plaintiffs seek to multiply damages on the basis of an assertion that each pirated item was protected by multiple marks, I conclude that both their evidence and their reasoning is faulty. With respect to the evidence, the plaintiffs have done nothing to demonstrate that any particular item at issue bore multiple specific marks. Instead, they simply make the conclusory allegation that Jean-Louis

> advertised, offered for sale, and/or sold at least four (4) types of products, handbags, wallets, shoes, and perfume bearing the Chanel Marks which are protected by sixteen (16) federal trademark registrations owned by Chanel and at least seven (7) types of products, handbags, wallets, umbrellas, scarves, hats, belts, and shoes bearing the [Vuitton] Marks which are protected by twenty-four (24) federal trademark registrations owned by Louis Vuitton.

Memo. at 15 (citing Hahn Dec. ¶ 5; Livadkin Dec. ¶ 5; Motion Exs. J-P). Apparently the plaintiffs expect the court to confirm their assertions by examining the dozens of thumbnail-size photographs of presumably counterfeit products collected in the screen-shots they have captured of web sites they claim to be associated with Jean-Louis, compare them to their lists of registered trademarks (*see* Memo. at 4 & 6-7), and determine for itself which products violate which marks – they certainly have made no effort to assist the court in that task. While I am easily able to discern from such meager evidence that the plaintiffs' assertion is at least partially false,[6] I candidly acknowledge that I lack both the expertise about the characteristics of the relevant trademarks and the keenness of vision necessary to accomplish the work that the plaintiffs apparently expect me to do. The plaintiffs should not expect the court either to be able to

---

[6] For example, some of the trademarks at issue do not appear on *any* of the allegedly counterfeit products about which the plaintiffs have presented evidence. Chanel complains of Jean-Louis's misuse of four trademarks that incorporate the characters "NO. 5" in various styles. Memo. at 4. However, out of the dozens of allegedly counterfeit products depicted in the exhibits drawn from the various web sites at issue, *see* Motion Exs. J-P, I can find only one item (a bottle of Chanel No. 5 perfume, *see* Motion Ex. J at 4) that appears to incorporate a single "NO. 5" logo.

conduct such an inspection or to have to try: if they wish to prove their damages on the basis of a formula that relies on showing that a single item infringes on multiple related marks, it is their burden to demonstrate the factual predicate for their position.

Rather than carry that burden, the plaintiffs' methodology suggests that they seek to dispense with the need for evidence by making a blanket assertion that the marketing of *any* counterfeit version of a plaintiff's product infringes on *all* of that plaintiff's registered trademarks, regardless of whether a given product actually incorporates all such marks in its design. Such reasoning is specious: for example, if a given counterfeit Chanel product bears a particular version of the "interlocking C" trademark, the counterfeiter may have infringed on that mark but he has not thereby also infringed on the remaining 15 marks that Chanel also owns and uses on different products. And yet that is precisely the kind of reasoning the plaintiffs seek to have the court embrace in asking for damages based on the formula they propose. *See* Memo. at 18.

For all of the reasons discussed above, I respectfully recommend that the court should reject the plaintiffs' proposal. Instead, I recommend that the court award $3,000 for each infringing item that the plaintiffs have proved Jean-Louis marketed. I thus turn to an examination of their proof in order to apply that method for awarding damages. That proof includes one exhibit each for Chanel items and Vuitton items marketed on each of the three web sites the plaintiffs assert Jean-Louis owned and operated. Motion Exs. J-P. For the reasons set forth above, I conclude that the plaintiffs have not carried their burden of proving any damages arising from the marketing of counterfeit items on the two "OfficialBag" web sites, and I therefore recommend that the court exclude the items in the corresponding exhibits, Motion Exs. K-M & O-P, in determining the appropriate award.

In the exhibit depicting the portions of the BestDeluxe.com web site relating to counterfeit Chanel products, the plaintiffs have presented sufficient proof that Jean-Louis marketed 37 distinct products, as summarized below.

- Ex. J at 1 – six bags described respectively as sac chanel cambon multipochettes, Quilted MM cuir noir, Quilted GM cuir blanc, Tote GM cuir noir, Tote GM cuir blanc, and Sac en fourrure noir/beige.

- Ex. J at 2 – two bags described respectively as Quilted cuir noir/marron and sac chanel cuir noir.

- Ex. J at 3 – six purses described respectively as Quilted M cuir noir, Quilted GM cuir noir, Quilted M cuir rose, Quilted GM cuir rose, Quilted Tote cuir noir, Quilted Cuir beige.

- Ex. J at 4 – four perfumes described respectively as Parfum Allure, Parfum Chanel 5, Parfum coco, and Parfum egoiste.

- Ex. J at 5 – three eyeglasses described respectively as Lunette pour femme ref#21, Lunette pour femme ref#22, and Lunette pour femme ref#23.

- Ex. J at 6 – six pairs of shoes described respectively as Tone Heels, Suede Classic, Suede Black, Classic Brown, Pink cc logo, Sandal Blanche.

- Ex. J at 7 – six bags described respectively as sac chanel cambon multipochettes, Quilted MM cuir noir, sac chanel cambon multipochettes rose, Bowling marron, Bowling noir, and Bowling blanc; however the first two of these items appear to be exact duplicates of similarly described items on the exhibit's first page, and I therefore do not count them separately in calculating damages, resulting in a total of four distinct infringing items on this page.

- Ex. J at 8 – six bags described respectively as Chanel Bucket noir, Chanel Bucket blanc, Chanel Classic noir, Chanel Classic rose, Chanel Classic blanc, and Sac Chanel tote blanc.

*See* Motion Ex. J. An award of $3,000 in damages for each of 37 distinct items produces a total of $111,000, and I therefore respectfully recommend that the court award plaintiff Chanel that amount on its Lanham Act claims.

In the exhibit depicting the portions of the BestDeluxe.com web site relating to counterfeit Vuitton products, the plaintiffs have presented sufficient proof that Jean-Louis marketed 30 distinct products, as summarized below.

- Ex. N at 1-2 – six bags described respectively as theda gm turquoise, theda pm multicolore, theda pm monogramme, nouveau theda, multicolore leonor, and theda rose (these two pages appear to be exact duplicates of one another).

- Ex. N at 3 – five bags described respectively as Coussin GM, Excentri-cité, Multipli-cité, Viva-cité GM, and Viva-cité MM.

- Ex. N at 4 – one "Theda bleu" bag that appears to be an exact duplicate of the "theda gm turquoise" item on the exhibit's first page; I therefore do not count it as a distinct infringed item in calculating damages.

- Ex. N at 5 – four "Alma epi" bags in various colors; however, because I can find nothing on this page to indicate that the bags were marketed as Vuitton products, the plaintiffs have not proved any damages with respect to these items and I therefore exclude them from my calculation.

- Ex. N at 6 – six bags described respectively as Nouveau theda, theda rose, Sac fourrure Vuitton monogramme, Theda Bleu; Dupleix monogramme, and Alma velours; however the first two of these items appear to be exact duplicates of similarly described items on the exhibit's first page, and I therefore do not count them separately in calculating damages, resulting in a total of four distinct infringing items on this page.

- Ex. N at 7-12 – each page shows a single bag described respectively as Mabillon, speedy 25, Alma, deauville beauty, Boulogne, and looping.

- Ex. N at 13 – one "Montre multicolore" watch.

- Ex. N at 14 – two belts described respectively as Ceinture multicolore blanche and Ceinture multicolore noir.

- Ex. N at 15 – four wallets described respectively as Tresor, Porte tresor noir, Porte monnaie plat, and Porte monnaie Cherry.

- Ex. N at 16 – two purses described respectively as Pochette noir and Mini sac blanc.

*See* Motion Ex. N.  An award of $3,000 in damages for each of 30 distinct items produces a total of $90,000, and I therefore respectfully recommend that the court award plaintiff Vuitton that amount on its Lanham Act claims.

2.  Copyright Claims

Vuitton is the owner of copyright registrations for two handbag print designs and dozens of photograph images protected by four copyrights, Motion Ex. F, and has the exclusive right to reproduce and distribute copies of these works to the public.  17 U.S.C. § 106 (1), (3).  Vuitton alleges that Jean-Louis violated its copyright protections by selling products featuring these print designs and by using their photographic images on his web sites.  Complaint ¶ 53; Memo. at 10.

While I am bound to accept all allegations in a well-pleaded complaint as true, Vuitton is not permitted to merely make broad and conclusory allegations with no specific factual basis. *See Hughes*, 449 F.2d at 69 (complaint must be well-pleaded and allege "specific acts" not mere conclusory and vague allegations).  The complaint alleges that "[t]he Defendants have infringed and will continue to infringe the LV copyrights at least by copying, selling, advertising, reproducing and placing into a chain of distribution, unauthorized copies or derivations of Vuitton's copyrighted works ...." Complaint ¶ 52.  *See also*, Memo. at 10.   Beyond these vague allegations, Vuitton has pleaded no facts alleging that Jean-Louis is selling or has sold specific goods containing Vuitton's copyrighted patterns, or that defendant has used any specific copyrighted photographs on any of the three web sites.[7]  As Vuitton has not pleaded any "specific

_____

[7]  A perusal of the web site printouts reveals several products decorated with a pattern similar to the copyrighted patterns "Multicolor Monogram – Black" and "Multicolor Monogram – White." Vuitton could easily have pleaded and proved – with a declaration from its expert that the patterns are in fact the same as the copyrighted patterns – that these items infringed its copyrights.  Vuitton could also have identified the specific photographs in dispute.

acts" of copyright infringement, I find that it has not sufficiently pleaded a claim under 17 U.S.C.

§ 106. *See Neznak*, 371 F. Supp. 2d at 133 (denying default judgment on several claims based

only on conclusory allegations which lacked a sufficient factual basis for a finding of liability).

### 3. Patent Claims

Vuitton alleges that Jean-Louis has infringed on its design patents in violation of 35

U.S.C. § 271. Complaint ¶ 59. Vuitton's patent claims suffer from the same infirmity as its

copyright claims: it has not sufficiently pleaded Jean-Louis's unauthorized use of its patented

designs. Vuitton alleges that the defendant is "importing or manufacturing, using, advertising,

selling, offering for sale and distributing handbags which are indistinguishable from Vuitton's

patented designs." Complaint ¶ 57. It has not alleged that any specific patents were infringed,

nor has it alleged that any specific products offered for sale by defendant have infringed them. It

has merely made conclusory allegations, lacking even the slimmest factual basis. What Vuitton

has done is, in essence, print copies of Vuitton's patents, print copies of pages from defendant's

web site, and invite the court to compare each product offered for sale to each Vuitton patent. I

respectfully recommend that the court decline that invitation to shoulder Vuitton's burden of

demonstrating its right to an award of damages.

### C. Injunctive Relief

Chanel and Vuitton request that the court permanently enjoin Jean-Louis from

manufacturing, importing, advertising, promoting, distributing, selling or offering to sell

counterfeit goods; from using the Chanel Marks, the Vuitton marks, the Vuitton Copyrights

and/or the Vuitton Design Patents in connection with the sale of any unauthorized goods; and

from doing anything that might lead consumers or members of the trade to believe his products

19

are in any way associated with plaintiffs. Complaint ¶ 69(a); DE 14-20 (Proposed Final Default Judgment and Permanent Injunction), 2-3. Congress has made such relief available to "prevent the violation of any right of the registrant of a [registered trademark] or to prevent a violation under" section 1125(a). *See* 15 U.S.C. § 1116(a); *Chanel*, 2007 WL 2693850, at *5. Accordingly, Chanel and Vuitton are entitled to an injunction if they can demonstrate that such relief is necessary to avoid irreparable harm and that they have no adequate remedy at law. *See id.* (citing *Rondeau v. Monsinee Paper Corp.*, 422 U.S. 49, 57 (1975)). In this context, "[p]ermanent injunctions are generally granted where liability has been established *and* there is a threat of continuing infringement." *U2 Home Entm't, Inc. v. Fu Shun Wang*, 482 F. Supp. 2d 314, 319 (E.D.N.Y. 2007) (emphasis added). Although Jean-Louis's default establishes his liability, it does not establish the threat of continuing infringement; and the plaintiffs, by failing as discussed above to link Jean-Louis to the "OfficialBag" web sites, have not established the latter threat.

The record amply demonstrates that Jean-Louis's sale of counterfeit Chanel and Vuitton products, if continued, is likely to cause confusion in the minds of consumers as to the origin of his goods. *See Chanel*, 2007 WL 2693850, at *5 (citing *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) ("counterfeits, by their very nature, cause confusion")).

The record is far less clear that Jean-Louis's infringing conduct is likely to continue absent injunctive relief. Each plaintiff sent Jean-Louis a cease-and-desist letter on September 1, 2005, notifying him of its ownership of the pertinent marks and demanding that he cease selling infringing counterfeit merchandise. DE 14 Ex. I (Declaration of Lynnette Oka) ("Oka Dec.") ¶ 6; Livadkin Dec. ¶ 12. Jean-Louis responded to the Chanel letter on September 2, 2005 and stated

that he had ceased and desisted from selling merchandise bearing the Chanel mark. Oka Dec. ¶ 7, Ex. 2.[8] The plaintiffs have failed to prove that Jean-Louis thereafter continued to infringe their rights. In attempting to adduce such proof, they rely exclusively on evidence relating to the "OfficialBag" web sites. *See* Oka Dec. ¶¶ 8-10; Motion Ex. R (Declaration of Virgilio Gigante) ¶ 3; Livadkin Dec. ¶ 15. Although that evidence easily proves that the latter web sites were offering counterfeit Chanel and Vuitton goods in violation of the pertinent trademarks (and I note that one of the two web sites apparently continues to do so, *see* Officialbag.net (last visited September 25, 2009)), for the reasons discussed above it does not establish that it was Jean-Louis, the sole defendant in this action, who was responsible for that infringement. As a result, I conclude that the plaintiffs have failed to meet their burden of establishing a likelihood of future infringement, and I must therefore respectfully recommend that the court deny their request for injunctive relief. *See U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The necessary determination is that there exists some cognizable danger of recurrent violation ....").

      D.     Costs And Attorneys' Fees

The plaintiffs seek the reimbursement of two distinct litigation costs: $350 for the filing fee they paid to begin the litigation, and $175 for the service of process on Jean-Louis. The cost of the filing fee is conclusively established by the docket and should be awarded. The cost of service is established by sufficient evidence in the record and should likewise be awarded. *See* Motion Ex. A (Declaration of Max Moskowitz) ("Moskowitz Dec.") ¶ 12 & Ex. 1.

The plaintiffs have also requested an award of "reasonable attorneys' fees" as part of the reimbursement of their costs, Motion at 2, but have failed to inform the court of the amount they

---

[8] There is no evidence that Jean-Louis ever responded to Vuitton's cease-and-desist letter.

request. Nor have they presented any evidence concerning attorneys' fees: after making the request in their notice of motion, the plaintiffs state that they rely on their "memorandum of law, the Declaration of Max Moskowitz, and the exhibits attached thereto." *Id*. None of those cited documents includes any information about attorneys' fees.

A party seeking an award of attorneys' fees bears the burden of demonstrating the hours expended and the nature of the work performed. The court should not grant such an award in the absence of contemporaneous time records for the relevant attorneys, *New York State Association for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983), or "summaries ... accompanied by affidavits stating that the summaries are accurate and based on contemporaneous records." *Pressman v. Estate of Steinvorth*, 886 F. Supp. 365, 367 (S.D.N.Y. 1995) (citing *Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148,1160 (2d Cir. 1994)). In that regard, I note that the plaintiffs submitted the evidence now before the court in response to an order in which I explicitly cautioned that they "must include [in their motion] a specific request for relief as well as all evidence supporting that request (or, if the movant seeks to adduce testimony at a damages inquest, a description of each witness to be presented)." DE 9. Accordingly, the record on which the court should consider the request for attorneys' fees (or any other aspect of the plaintiffs' motion) is closed. I therefore respectfully recommend that the court deny the plaintiffs' request for an award of an unspecified amount of attorneys' fees.

III.    Recommendation

For the reasons set forth above, I respectfully recommend that the court enter a default judgment in favor of plaintiffs Chanel, Inc. and Vuitton, S.A. against defendant Michael Jean-Louis, and that it award judgment to plaintiff Chanel, Inc. in the amount of $111,000 on its

Lanham Act Claims; award judgment to plaintiff Louis Vuitton Malletier, S.A. in the amount of $90,000 on its Lanham Act claims; award of costs in the amount of $525 to be shared by both plaintiffs; and deny the remainder of the plaintiffs' requests for relief, including judgment on the copyright and patent claims, their request for injunctive relief, and their request for an unspecified amount of attorneys' fees.

IV.     Objections

I direct the plaintiffs' counsel to serve a copy of this Report and Recommendation on the defendant by certified mail no later than September 30, 2009, and to file proof of service with the court no later than October 7, 2009.  Any objections to this Report and Recommendation must be filed no later than October 14, 2009.  Failure to file objections within this period waives the right to appeal the District Court's order.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *Beverly v. Walker*, 118 F.3d 900 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52 (2d Cir. 1996).

**SO ORDERED.**

Dated:  Brooklyn, New York
        September 26, 2009

/s/ James Orenstein
JAMES ORENSTEIN
U.S. Magistrate Judge